When you're ready. May it please the court. My name is Tim Bechtold, representing the Alliance for the Wild Rockies today. When a guy in Trail Creek, Montana wants to go hunting, he puts down his tailgate, puts up his ramps, drives his ATV into the back of his truck, drives up into the woods, parks at a gate or parks at a berm, gets out his ATV, drives around the berm, and goes back into the woods. along that road behind a berm. Is that in the record? The record says... I hope that's not your record. It's not mine, Your Honor. And it's no different for a huckleberry picker, Your Honor. It's not just someone who's out hunting stuff. Let me ask you a question. If I agree with the Forest Service as to the interpretation of the linear miles of total roads, then would I affirm as to compliance with the NFMA? I think, Your Honor, if you... I mean, it seems to me this case boils down to linear miles of total roads. If you lose on linear miles of total roads, then they're in compliance with the NFMA, they're in compliance with the NEPA, and the incidental take statement, and thus the ESA. I think you're right. Okay. I just wanted to make sure. That's the way I read it, and I wanted to make sure I was on with you. It's a domino. If they're right on one thing, then they're right on all of them. And so the whole point here is that the Forest Service says, we get to say what we want about our own forest plan. You must defer to us. And what the Alliance contends, Your Honor, is that when you're dealing with the ESA listed species, that that deference doesn't apply. What they must do under TVA v. Hill and Conner v. Burford is the benefit of the doubt has to switch, and it has to go to the protected species. Let me ask you another question which goes around some of the arguments, but nonetheless gives a way for us to decide. Why isn't linear miles of total roads ambiguous? Well, I think it is ambiguous because... Then must I defer to the Forest Service's reasonable interpretation? No, I don't think so, Your Honor, because in that case you have to give the benefit of doubt to the species. So that's precisely it. Well, but just a minute. It seems to me in these particular matters that if I'm going to say that term is ambiguous, then as long as the Forest Service's interpretation is reasonable, I have to give deference to that, don't I? If this were just a NEPA-NFMA context, yes. But because it's in the ESA context, the answer to that is no. In this situation, I think what we have here is a situation where the linear miles of total roads is defined somewhat differently in different places throughout the record. So I wouldn't say necessarily it's ambiguous. What I'm saying is it's defined differently in different places. Well, I understand that. I'm not even asking you to agree that it's ambiguous or it isn't. My question was mere if I find it ambiguous, do I give deference? You know, as I said, if it was just a NIFA-NFMA case, yes. But because it's an ESA case, the answer is no. I'm having trouble. What case do you have that says if it's an ESA case, I don't give deference? Well, what Conner v. Burford says is that. . . Conner, is that your best case? If it is, don't go further because I've looked at Conner. In Sierra Club v. Marsh, too, as well, Your Honor, it says the courts must afford a dangerous piece as the highest of priorities. And similarly in TBA v. Hill. . . I understand what I have to accord the highest in priority, but I'm not talking about that now. It seems to me that so does the Forest Service. And now they've got an ambiguous statute and they have to make an interpretation, therefore. And according to the species, the highest in priority, they make their determination. And then my question is, do I defer? And I don't think there's a case that says I don't defer. So I think you have to make your case pretty strong. There is. . . That's all I'm trying to tell you. I am not aware of a case that says that when there is an endangered species that you have to defer. There's a couple cases like Barbalatos that come at the edge to say, you know, when they compete, you have to define what's compete, and that hasn't been done. And that same provision is in this forest plan as well. It wasn't just in the Flathead plan. It's also in the Kootenai plan. And that is when, I think the quote is, always when resources compete, then the decisions must be made in favor of the bear. And that's in Appendix 8 of the Kootenai Forest Plan. All right. And that's an all-management situation, habitat for grizzly bears. Let me come back to what you opened with, because you're postulating that berm will not, in fact, prevent motorized access. You're saying that the hunter or the huckleberry picker or anybody else who wants easy sort of transportation once past the berm will manage to get their all-terrain vehicle past that. Is that what you're suggesting? That's just the point of reality, Your Honor. Well, then, if that's what the berm does or doesn't do, that berm is in violation of what the standard is. The standard says roads must be closed with a berm, guardrail, or other measure that effectively prevents motorized access. You're assuming, then, that they're not complying. Because if it doesn't effectively prevent motorized access, they're not following the guideline. That's absolutely true, Your Honor. So you're absolutely true that they can't do it or they won't do it? That they can't. A berm will not prevent motorized access. Well, then, they better do something else because it says berm, guardrail, or other measure. And the other measure? If they're closing this road but doing it in such a way that allows motorized access, they're in violation. I agree. So you're saying they're going to violate? Well, the point is, unless they recontour and revegetate, which is what the Grizzly Bear Recovery Plan requires to remove roads from the database, then that's the only way to prevent motorized access. Because, as a simple matter, roads are there. People use them. That's how it works. Well, I'm having trouble following the logic. If they offset by reducing some public access elsewhere, that doesn't protect the species or the forest. So I'm under-reading. They would have to do what? Offset. But that would still leave the berms in this particular site. And so the idea is to make sure that the road that they're creating can't be used. And that's why they're putting up berms or whatever. Now, it may be that you would have some complaint that they're not enforcing it or that they didn't build it the right way. But that's not right. That's pure speculation. So I don't understand how it fits in with your reliance on the interpretation of the roads. Your Honor, the analysis unit is the BORS. So the BORS unit, in this case, it's the Clark Fork BORS. So the total linear miles of road has to be accounted for within that BORS. So in this case, if they were going to build new miles of road, they would have to obliterate or revegetate a similar number of miles of road somewhere within the BORS. So it doesn't have to be necessarily within the project area, in this case the Pilbaram Project, but it has to be somewhere within the BORS so that the total miles of road within the BORS is limited. But it would still be the site that is being affected by this. So the remedy is to put in the berm to make sure that there isn't adverse effect on the species, at least through the motorized traffic, by putting in this road. It seems to me you've got a decent lawsuit if, after a berm is put in, it turns out that motorized access has not been prevented. You come back in and you say, well, listen, you've got to do something else. There's other measures that have to be effectively prevented. So if you've got hunters, huckleberry pickers, or whoever else is coming in with an ATV that gets over the berm, bingo, you've got a good lawsuit. Yeah, and where's your final agency action? So that's basically challenging the implementation of an action. There's another question that you raised by your argument, and that is I go to the temporary roads. They're permissible so long as the newly constructed roads are gated during the duration of the project, are closed immediately upon completion, requiring use of the roads by a berm that effectively prevent the motorized access and will not require motorized access for at least ten years. Why is your argument as to what happens afterwards any different than what happens during the temporary use? Because the access standard 2B specifically allows for that temporary increase during the pendency of a project. Well, but what they have to do, even in that case, is gate them, keep people from using them as best they can. And I'm having trouble finding why the gating them at temporary time is any different than what you're saying, berm, guardrail, or other measure. Because it seems to me that what they're doing in the newly constructed temporary thing is they're keeping everybody off except what they will allow there. And then afterwards, they're trying to keep them off totally by berms, guardrail. They're not going to have it gated. They're going to do worse. They're going to put berm, guardrail, or other measure. And what you're saying, that isn't enough either. Is that what you're saying? Well, and the difference is simply in what the access amendment allows. So I can't ask the Forest Service to do more than what the access amendment allows. So if during the pendency of the project... That's why I worry, because the access amendment allows the berm, guardrail, or other measure. But not after the completion of the project. After the completion of the project, the linear miles of roads have to be no net increases in any bores above the baseline as stated. So in other words, then it comes down to, as you noted at the outset, it's all what matters is what can be considered a linear mile of total road. Well, we know that the linear miles of total roads includes roads that don't have restrictions on motorized use and roads that are closed to public motorized use. So how can that not include roads that are behind barriers? So the simple matter is, is that in the ROD, which is the operative document in this case, it says, increases in linear miles of total roads will not be permitted. Addressing this standard will require reclaiming or making hydrologically neutral any new construction upon completion of project activities. So there's definitely a difference between the pendency of project activities and the completion, and the standard 2B allows for that. The Forest Service can have temporary increases, but after the project is finished, they have to bring it back down to baseline. And what we're talking about really, what we're really arguing about, as I understand it, is whether closing all the roads with berms, barriers, or other project device is enough to make the decrease. That's right. Yeah, now I'm earlier in this same standard. I'm at Roman 2A. The forest shall ensure no increases. Are you with me? Yeah. The forest shall ensure no increases in permanent linear miles of open road. Well, the roads we're talking about were temporary roads and are now closed roads. Right, so what's at issue in this case is only standard 2B, not standard 2A. Well, I understand that, but I'm trying to figure out how I'm supposed to calculate the linear miles that are allowed, and it sounds as though the linear miles that are allowed, and that has the limitation on it, the limitation is on open road. And there is a limitation on the total. The only limitation in the BORS is on the total miles of linear roads. There is no specific limitation under standard 2B on the open roads. I'm sorry, say that again. Standard 2B doesn't have a limitation on open roads. That's only for standard 2A. Oh, I see what you're saying. Okay. But the footnote to standard 2B says linear miles of roads includes roads that do not have restrictions on motorized use. That's right. And roads that are closed to public motorized use. That's right. That's what we're really determining, is it not? That's right. And what we're really saying is, what you're saying is, berm, guardrail, or other measure effectively preventing motorized access is not enough. That's right. Those are roads that are closed to public motorized use, and it's included within the definition. They certainly have restrictions. They are. Well, then they're not included. Linear miles of total roads includes those that do not have restrictions. And? And roads that are closed. Is that both, or is it either? I think it's written in the disjunctive. Well, if it's disjunctive, there's certainly restrictions. That was my biggest question. It seems to me that they do have the restrictions on the motorized use. They have a berm, they have a guardrail, or they have another measure. That's certainly a restriction, even if not closed. Right. Your Honor, that's why it says those that do not have restrictions. Okay. Let's hear from the other side, and we've taken you up to time, but we'll give you a chance to respond. Thank you. Good morning, Your Honors. May it please the Court. My name is Tecla Hanson-Young, and I represent the Forest Service and the Fish and Wildlife Service. I think it would be really helpful if the Court turned to page SCR 460 of the supplemental excerpts. On that page, it shows a picture of what these berms look like. And it's in a contract that is required and that was submitted in the record in the district court. They are three feet high and three feet deep, so a total of six feet, and they are steep. And they go across the full length of the road opening. So to the extent that there are any concerns about people passing these berms, those concerns are unfounded. And I spoke with the Forest Service this week, and they have had no instances of unlawful use on these roads, either while project activities are occurring or after they are closed with berms. I also think it would be helpful for the Court to look at 460 to 462 in the record, which is the remainder of the contract, and it explains what contractors are required to do to close these roads when they are done with project activities. The roads, first of all, are dirt roads. They have culverts installed to protect water quality, and they have ditches and water bars as well also to prevent sediment runoff. And they are gated and locked with keys during the life of the project activities, which are short, usually only lasting one or two seasons at most. As soon as they are done within two weeks of project activities being finished, the roads are closed by the contractors. And what those pages show is that the contractors must scarify the roads, which means turn up the soil to loosen the soil, reseed the dirt bed, and remove the culverts. Where the culverts were, they have to recontour the road to restore natural stream conditions in the places where water would have flowed, and that protects water quality. And then these berms are constructed. The berms are also seeded. And the areas revegetate within one or two years. Vegetation starts growing. They are completely impassable within five, six years. Impassable by motorized vehicle, you mean? Yes. So if somebody wanted to walk along there, it looks like a pretty good place to walk for quite a long time. You could walk. But again, the purpose of the access amendments is to control motorized access in the forest because the harm to grizzlies occurs from concentrated use along roads that occurs as a result of motorized access. You could walk, but you're not going to get as far as you would get with a road, with a motorized use of the road. Another important thing for the court to think about in the context here is that this project is a good project, and the plaintiffs have not actually challenged the environmental soundness of the project as far as its benefits. It will remove root-diseased dying trees and pine beetle-infested trees that pose huge fire risk in the forest. There was a catastrophic fire there last year that consumed about 2,000 acres of habitat, and this project is designed to reduce the fuel loads. There's controlled burn as a part of this project that reduces that risk of catastrophic fire as well as removing the diseased and dying trees. While they're still economically viable, which also helps promote the local economy, this project is also good for forage for grizzly bears, and the plaintiff hasn't disputed that either. It's good for forage because there's aspen stand clearing, which promotes aspen shoots to grow. Grizzlies like to eat the shoots and the new vegetation that occurs after prescribed burning. This is all good for grizzly bears, and another important thing for the court to realize is that this project is occurring in a bears-outside-of-recovery-zone area, so it's not in core bear habitat. And so there's a lot of good things about this project that help promote the habitat for grizzly bears. We're not even sure if the bears are using it, but they could use it. It's available for them. The plaintiffs haven't challenged that. I think we all know that the question on appeal... these roads are somehow a permanent increase in total roads, and that is not supported by the language of Standard 2B. The plain language clearly allows a temporary increase in roads, and even Alliance for the Wild Rockies has not disputed that these roads meet that temporary increase standard. What they are suggesting is that even though the roads meet that plain language standard, they're gated to prevent public motorized use during project activities, they are closed with a berm after the project is complete and made impassable to motorized use, and they're left in a way so they won't need to be accessed again for 10 years. What Alliance sort of suggests is that even though these roads meet that standard, the fact that it still takes several years for them to be restored to pre-project conditions violates the language. It's just not supported by the plain language here, and even if it was ambiguous, which it's not, the Forest Service would get deference on that point, and this court has made that clear in numerous cases. One of them is the Earth Island Institute case. It's cited in our brief, and the site is 697 F3rd at 1013. There are several other... Let me ask you a question. It seems to me your opponents suggest that the roads will not be returned to hydrologically neutral. You're right, Your Honor. I actually have six responses to that, and I hope I will be able to get through them. I thought about that a lot because, first, that's a new argument that was never raised in the district court or on appeal in the opening brief, so I had to spend a lot of time looking at that to prepare for argument today. I think this court should not consider that argument, firstly. Secondly, if you look at where this language appears, it appears in a response to comments in the record of decision. At SER 2... Exactly where it is. Yes, it is not in the language of the standard itself. Thirdly, looking at this language, it appears as though it applies to the offsets part of Standard 2B, so the Forest Service can meet the access amendments standards by either offsetting roads, offsetting new roads, or falling under this temporary increase provision. The requirement to reclaim or make hydrologically neutral a road appears to apply to offsets only. And let me just explain what... Apply to what only? Offsets only. Offset. Let me explain what reclaim or make hydrologically neutral is. That means obliterate the road completely from the surface of the forest. So you have to recontour the whole thing, not just where the culverts are, and you have to plant new trees. There's other things you can do, but you're basically obliterating the road. I think a definition of that, of reclaimed or obliterated road, is in the... I think it's at 436 of the supplemental excerpts. The access amendments don't even require that level of reclaiming or obliteration of a road in core bear habitat, which is more managed and more protected because bears are actually using it. So it would make no sense to interpret Standard 2B, which applies to bears outside of recovery zones habitat, in a way that makes the management there more strict than the management in core habitat. And the reason why it's not necessary is, again, or why the Forest Service and the Fish and Wildlife Service haven't required this more restrictive standard even in core habitat is because it's not necessary. Because, again, the purpose of the access amendments are to prevent motorized use, which can be accomplished through a barriered road. And my last point on this is that the roads here will actually be partially reclaimed and made hydrologically stable. So not neutral, which means the ground water flow would have to be the same as it was previously, but stable, meaning the runoff will be protected. And there's a chapter in the EIS for the project dealing with hydrology, and that starts at AR 238-46. It wasn't included in the excerpts because we didn't brief that issue. And there's a monitoring requirement in the record of decision at AR 243-48, which talks about how the Forest Service has to get out there and look at the roads and make sure that they are following best management practices and that sediment is not running off these roads. Finally, I would just like to say that if the court finds that the Forest Service were to lose on the first question, I think, that your Honor started out with, is it a sort of a cascade? If we lose on the NIFMA claim, do we lose on everything else? I'm not sure that's true because I think there was a Section 9 ESA claim. There's no evidence of take that has occurred here. So there would be no Section 9 violation. Well, it doesn't seem to me that if, in fact, there's not any increase in linear miles of toll roads, that there can be a take. That's correct. Yeah, I mean, I think that's correct. But in order for there to be a take, there would actually have to be a bear that was harassed. I understand what you're saying, but you're having trouble with the take. Yes, I just wanted to make that sort of technical. But I think the other side already said, listen, if we conclude that there's no increase in roads above the baseline,  Yes, I think that's correct because the project, then, is consistent with the take statement for the access amendment. So the whole focus is the argument that you've so far been engaged in with your adversary. Yes, that's correct. I think that unless the Court has no further questions, I would ask that the Court affirm the judgment of the District Court. Okay, thank you. Thank you. Mr. Beckold, two minutes. Thank you. Your Honor, the USGS, in 2016, released a report. Katie Kendall had done a report of the DNA analysis of the grizzly bears in the Kabanayak. And she found that 75% of the bears in the Kabanayak ecosystem have home ranges that extend outside of the recovery zone. In other words, those bears' home ranges extend into the boars. That's why it's important. She also found that there are about 42 bears there, which is a little different from what the Fish and Wildlife Service had previously estimated. And we also know from a Freedom of Information Act request that there were four human-caused bear deaths in this ecosystem in 2015. So that's the update. So why is this important? Because roads kill bears. I mean, it's really that simple. That's what the US Fish and Wildlife Service found when they created the recovery plan. They know that roads probably cause the most significant threat to grizzly bear habitat. So the whole reason to not have roads on the landscape is to prevent access for humans, because it's humans who kill bears generally. Most of the bears that die in the Kabanayak are killed by humans. So I think when you challenge a monitoring claim against the Forest Service, you lose. This court has already determined that. That's a SUA thing. It's a discretionary function, so they don't have to monitor if they don't want to. So even though we've asked for the monitoring data, we show that there are motorized violations. That's not a cause of action in this court. So what do we do? We challenge it when they create a project like this. And so that's what we've done, is say, Look, we know that from the past that your monitoring is not effective. We know that your berms are not effective, so this is the time to challenge it. Here and now, not later, because there's no ex post facto review. Thank you. Thank you very much. I thank both sides for their arguments. Alliance for the Wild Rockies v. Bradford submitted for decision. And our last case this morning, Alliance for the Wild Rockies and Native Ecosystems Council v. Kruger.
judges: W. Fletcher, Fisher, N.R. Smith